## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MICHAEL THADDEUS WADE,           *

    Plaintiff,                    *

    v.                            *

                                                           **CIVIL NO. JKB-21-1133**

ELECTROMET CORP., et al.,         *

    Defendants.                   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

*Pro se* Plaintiff Michael Thaddeus Wade brought retaliation claims against his former employer, Electromet Corporation ("Electromet"), and three Electromet employees, Sandy Miller (Human Resources Manager), Randy Golden (Plant Manager), and Todd Sites (Supervisor). (*See generally* Compl., ECF No. 1.) Following the Court's ruling on Defendants' Motion to Dismiss, the surviving claims are a Title VII claim against Electromet and 42 U.S.C. § 1981 claims against all four Defendants. (*See* ECF Nos. 30, 31.) Now pending before the Court is Defendants' Motion for Summary Judgment, (ECF No. 35), which is fully briefed and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, the Court will grant the Motion.

### I.    *Factual Background*

#### A.  *Work Performance*

Wade was first hired by Electromet, a manufacturing company, as a machinist in 2004. (ECF No. 35-1 at 8.) In November 2018, Electromet was acquired by new owners, and "[n]ew management was instructed to increase efficiency and production while minimizing wasted work time." (Miller Aff., ECF No. 35-4 ¶¶ 8–9.) This resulted in employees being counseled "for using

1

their phones during work and smoking outside of their normal smoke breaks." (*Id.* ¶ 11.) After the acquisition, Golden was hired as the Assembly Plant Manager, a role in which he oversaw employees, including Wade. (ECF No. 35-1 at 8.) In that role, "one of [his] priorities was increasing efficiency and compliance with Electromet's policies and procedures, including cell phone use, attendance, and breaks." (Golden Aff., ECF No. 35-5 ¶ 7.)

In January 2020, Mike Hearn became Wade's direct supervisor, reporting to Golden. (ECF No. 35-1 at 9.) During January through September 2020, Hearn and Golden counseled Wade multiple times on various performance-related issues. For example, in January 2020, Hearn told Golden that "he counseled Wade several times for being away from his work station and smoking outside of work breaks." (Golden Aff. ¶ 10.) In June 2020, Wade was on his phone at work and Golden "counseled him that this was against Company policy and asked him to put his phone away." (*Id.* ¶ 11.) In June and July 2020, Golden temporarily allowed Wade to work an alternate schedule, but on August 3, 2020, he informed Wade that he needed to return to his regular schedule. (*Id.* ¶¶ 12–18.) Wade was "upset" by this and "walked away from [Golden] and told [Golden] that he quit." (*Id.*) Wade then told Hearn that he rescinded his statement about quitting. (*Id.*) Golden and Miller met with Wade on August 4, 2020, and notes relating to that meeting reflect that Golden and Miller "reinforc[ed] the need [for Wade] to be available for his regular schedule" and "[w]arned [him] that walking off the job is not acceptable." (Aug. 4, 2020 Mem., ECF No. 35-9.)

On September 7, 2020, Sites became Wade's direct supervisor. (ECF No. 35-1 at 11.) Sites "was instructed to continue working on Company culture and find ways to increase efficiency" and "to monitor for cell phone use, excessive smoke breaks, and staying in an employees' work area." (Sites Aff., ECF No. 35-6 ¶ 7.) Wade "was one of the employees who

2

required counseling for using his cell phone, taking smoke breaks outside of approved break times, and going out of his work area." (*Id.* ¶ 8.) There were other employees who received similar counseling, but "most of the employees were able to correct their behavior[.]" (*Id.* ¶¶ 9–10.) Sites observed Wade "struggl[ing] to stay in his work area, using his cell phone during work, and taking unapproved smoke breaks" and noted that these behaviors had been reported to him "on several occasions by Wade's coworkers." (*Id.* ¶ 11.)

Sites "relayed to [Golden] the persistent performance issues that Wade was having[.]" (Golden Aff. ¶ 20.) For instance, on September 16, 2020, Sites emailed Golden, Miller, and Pam Shatzer (Manufacturing Manager) regarding Wade "fill[ing] up his car tires" during work hours without permission. (Sept. 16, 2020 Email re: Mike Wade, ECF No. 35-10.) Sites also noted that "[he] ha[d] had to run [Wade] off while sneaking in extra smoke breaks out of the back of the building" and that he would "continue to monitor that." (*Id.*)

On September 24, 2020, Wade had a meeting with Golden and a human resources assistant at which Golden "addressed Wade's performance issues, including his excessive phone usage, unapproved smoke breaks, and unexcused time away from work." (Golden Aff. ¶ 21.) During this meeting "Wade acknowledged that he had used his phone during work and that he took care of personal issues during work time" and Golden also informed Wade that "other employees were being counseled for the same issues." (*Id.* ¶¶ 22–24.) An email summarizing the meeting indicates that the following issues were addressed during the meeting: "[e]xcessive phone usage"; "[e]xcessive smoke breaks"; and "[e]xcessive time away from work area." (Sept. 24, 2020 Email re: Mike Wade, ECF No. 35-11.) Wade "disputed being away from his work area excessively, but agreed to the phone usage and taking care of personal issues during work times." (*Id.*)

Although Wade does not explicitly concede any of these instances of counseling, he does not dispute them. Wade alleges that he "ha[s] worked for three previous supervisor[s] and not one of them would be able to say that [he] ever refused to do [his] job or did not know how to do [his] job" and that he has always received "satisfactory/good" performance reviews. (ECF No. 37 at 5.) He explains that he has "never been a problem or had any write ups or disciplinary actions." (*Id.* at 4.) He also explains, in August 2020, he and two coworkers received gifts for outstanding job performance. (*Id.* at 6.)

### B. Protected Activity

Although it is undisputed that Wade engaged in protected activity, the parties provide differing explanations of the protected activity. Wade explains that he internally reported two incidents of co-workers using a racial slur. He explains that the first of these incidents occurred in September 2020, when one of Wade's co-workers told him that another co-worker had used the slur while telling a story. (ECF No. 37 at 1.) Wade alleges that he reported the incident to Miller, who spoke to Wade's co-workers, and they confirmed the story. (*Id.*) About a week later, Wade overheard two co-workers use the slur. (*Id.* at 2.) Wade alleges that he reported this incident to "the plant manager in Human Resources[.]" (*Id.*) Wade explains that Sites was watchful and critical of Wade following Wade's reports of his co-workers' uses of the racial slur. (*Id.* at 2–3.) For instance, Wade alleges that after he reported these incidents, he "started noticing things that [his] supervisor would do[,]" like "following [him] without his knowledge" and preventing him from "operat[ing his] machine." (*Id.* at 2.)[1]

---

[1] Wade does not point to any evidence in the record with respect to his reports of the slur or Sites' behavior. Rather, this information is contained in Wade's Response in Opposition to Defendants' Motion for Summary Judgment, a version of which he also used as his Response in Opposition to Defendants' Motion to Dismiss.

Defendants' version of events is as follows. On October 27, 2020, Wade asked Sites if he could "address his coworkers about the misuse of the N word" at a team meeting. (Sites Aff. ¶ 16.) Sites refused, as "it wasn't a typical time for an employee to make an announcement[,]" but Sites "could tell that [Wade] was concerned so [Sites] asked Golden to talk to [Wade]." (*Id.* ¶ 18.) Wade told Golden that "he had heard from one unidentified employee that another unidentified employee had used the N word at work." (Golden Aff. ¶ 27.) Wade refused to provide further information, and Golden reported the issue to Miller. (*Id.* ¶ 28–30.) Miller asked Wade for details regarding the incident, but Wade refused to provide information other than that it was "someone in shipping" who overheard the use of the slur. (Miller Aff. ¶¶ 16–19.) Miller deduced that the employee was Ninfa Sollenberger, who denied hearing anyone use the slur. (*Id.* ¶¶ 19–21.) Wade asked Miller to "drop it." (*Id.* ¶ 24.) Miller averred that Wade "did not report that any other employees used the N word at any other time or follow up with [her] again[.]" (*Id.* ¶ 25.) Golden likewise averred that Wade never made further reports of the use of a slur at work. (Golden Aff. ¶ 31.)

### C. *November 4, 2020 Meeting and Wade's Suspension and Resignation*

On November 3, 2020, Sites "found Wade hiding behind a cabinet using his cell phone." (Sites Aff. ¶ 19.) Sites "found him doing the same on November 4, 2020." (*Id.*) Sites counseled Wade that this was against policy and Wade "walked away from [Sites] and disappeared for 10 to 15 minutes." (*Id.* ¶ 20.) On November 4, 2020, Sites emailed Miller and Golden to report "several complaints about Mike Wade not being in his area and also being on his phone (hiding in cabinet)." (Nov. 4, 2020 Email re: Mike Wade – Discussion ASAP, ECF No. 35-13.) Sites stated that "we need to have a discussion with [Wade] today on his work ethic and phone use" as it was "[a]ffecting others in his area." (*Id.*) Miller responded that she could "personally recall at least three times in

the last six months [that Wade] has been addressed on similar issues"; that they "need[ed] to discuss some sort of consequence for this"; and that they should "meet and discuss and come up with a game plan." (Nov. 4, 2020 Email re: Mike Wade – Discussion ASAP, ECF No. 35-14.) That day, Miller, Golden, and Sites decided to provide Wade with a written warning due to the "persistent performance issues which had been documented throughout the summer and fall of 2020." (Miller Aff. ¶ 28.)

Miller, Golden, and Sites had a meeting with Wade that day. (*Id.*) At the meeting, Miller provided Wade with a written warning. (*Id.* ¶ 29.) The parties differ in their descriptions of Wade's behavior during the meeting, but both agree that Wade used profane language and accused his supervisors of lying. Defendants aver that Wade repeatedly interrupted Miller, refused to sit down, said that Sites was a liar, and stated that "he was going to whoop Sites' ass." (Miller Aff. ¶ 29; *see also* Golden Aff. ¶¶ 38–48; Sites Aff. ¶¶ 24–34.) Wade explains that he "repeatedly told them that these are lies" and that he said "lying assholes" "under [his] breath[.]" (ECF No. 37 at 3.) Wade explained that, after the meeting, he stopped Shatzer and told her that believed he was being retaliated against. (*Id.*)

In a November 4, 2020 email to Sites, Miller, Golden, and others, Shatzer explained that, "[a]fter talking with Randy [Golden] and Todd [Sites]," she believed that they should "suspend [Wade] a minimum of 3 days." (Nov. 4, 2020 Email re: Michael Wade Document, ECF No. 35-16.) She explained that "[w]e need to be very stern in the fact that challenging and threatening a supervisor are grounds for immediate termination and it will not be tolerated." (*Id.*) She noted that "I am sure we need to be careful with respect to him playing the race card. [Wade] stopped me and really stressed that to me, I immediately rebutted that [sic] fact that it was a factor and the

6

examples he also gave me of his smoke, bathroom, and phone breaks were the reason for this sit

down and that was it." (*Id.*)

Wade's suspension letter indicates that "effective November 6, 2020, you are placed on a

3 day suspension without pay resulting from the threatening and aggressive behavior you displayed

toward your supervisor in our meeting on Wednesday November 4, 2020.  Your language was

profane, threatening and abusive and is not and will not [be] tolerated at Electromet." (Nov. 5,

2020 Suspension Letter, ECF No. 35-17.)  On November 10, 2020, Wade called Miller and notified

her that he was resigning. (Miller Aff. ¶ 37.)

### II.    Legal Standard

Federal Rule of Civil Procedure 56 provides that a party can move for summary judgment

on a "claim or defense—or the part of [any] claim or defense," provided it shows "that there is no

genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  The burden is on the moving party to demonstrate the absence of any genuine

dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If a party carries

this burden, then the Court will award summary judgment, unless the opposing party can identify

specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for

trial.  Fed. R. Civ. P. 56(e).  If sufficient evidence exists for a reasonable factfinder to render a

verdict in favor of the party opposing the motion, then a genuine dispute of material fact is

presented, and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  However, the "mere existence of a scintilla of evidence in support of the

[opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.

Rule 56 requires parties to support summary judgment arguments with sufficient citations

to the record. Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must

7

support the assertion by [either] . . . citing to particular parts of materials in the record, . . . [or] showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"). "Failure to cite admissible evidence is especially perilous where, as here, the non-moving party is the plaintiff, who bears the ultimate burden of persuasion." *Jones v. United Health Grp.*, Civ. No. JKB-17-3500, 2019 WL 1903668, at *6 (D. Md. Apr. 29, 2019), aff'd sub nom. *Jones v. UnitedHealth Grp., Inc.*, 802 F. App'x 780 (4th Cir. 2020); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" for which it "will bear the burden of proof at trial," "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

### III.   *Analysis*

On the record before the Court, a reasonable factfinder could not conclude that Wade's protected activity was the but-for cause of any purported adverse employment actions. Given the uncontradicted evidence of the history of Wade's performance issues, which began before he engaged in protected activity, and his insubordination during the November 4, 2020 meeting, Wade cannot establish causation by temporal proximity alone. Further, Wade has failed to present any evidence suggesting that the reasons provided by the Defendants for the employment actions were pretextual, which dooms his claim of retaliation. Defendants' Motion will therefore be granted.

### A.   McDonnell Douglas *Framework*

Wade has presented no direct evidence of retaliation, so the Court will analyze his claims using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973). Under that framework, a plaintiff must establish a prima facie case by showing: "(i) that [he] engaged in protected activity, (ii) that [his] employer took adverse action against [him], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (quotations and citation omitted). Next, the burden "shifts to the [defendant] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* If the defendant sustains its burden, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.* (quotations and citation omitted). "[T]o carry this burden, a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." *Id.* at 252. The plaintiff "retains the ultimate burden of persuading the trier of fact that his engagement in the protected activities was a 'but for' cause of" any adverse employment action. *Staley v. Gruenberg*, 575 F. App'x 153, 155 (4th Cir. 2014) (citations, quotations, and alterations omitted).

The Court will assume that Wade has established a prima facie case of retaliation. Further, the Court finds that Defendants have met their burden with respect to providing a legitimate, non-retaliatory reason for any adverse employment actions. Here, Defendants have presented evidence that Wade was counseled multiple times beginning in January 2020 and ultimately received a written warning due to issues relating to his productivity, including taking unauthorized breaks. Further, Defendants have presented evidence that Wade's behavior during the November 4, 2020 meeting was inappropriate, which resulted in his unpaid suspension. This showing is sufficient to carry Defendants' burden. *See Kozlowski v. Hampton Sch. Bd.*, 77 F. App'x 133, 140 (4th Cir. 2003) (explaining that a defendant's burden is not a heavy one and that "the defendant is not

9

required to prove that it had a legitimate, non-[retaliatory] reason for its actions, but simply to present evidence from which a reasonable fact-finder could conclude that the defendant acted based on a legitimate, non-[retaliatory] reason.").

Therefore, the Court will focus on the third step of the *McDonnell Douglas* inquiry. *U.S. Equal Employment Opportunity Comm. v. CACI Secured Transformations, LLC*, Civ. No. JKB-19-2693, 2021 WL 1840807 (D. Md. May 7, 2021) (explaining that where, as here, a defendant advances a non-discriminatory reason for the adverse employment action, "the summary judgment inquiry focuses largely on the third step"). In other words, the Court will focus on whether Wade has met his ultimate burden of showing that Defendants' proffered nonretaliatory reasons were a pretext for discrimination.

For purposes of the pending Motion, the Court has discerned three potentially adverse employment actions from Wade's submissions: (1) Sites' alleged hypervigilance and criticism of Wade; (2) counseling, including the November 4, 2020 written warning;[2] and (3) the unpaid suspension.[3] The Court finds that Wade has failed to present evidence from which a reasonable

---

[2]     The Court is skeptical that these first two actions amount to adverse employment actions. To constitute an adverse action, the action must be "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

     Sites' hypervigilance and criticism—which included, as Wade testified, that Sites was watchful him; that he was taking out the trash and Sites told him to "[g]et back to work"; and that Sites once instructed him to operate a different machine than the one he typically operated (Wade Dep., ECF No. 35-7 at 15–18)—do not amount to actions that would dissuade a reasonable worker from engaging in protected activity. Rather, this alleged behavior appears to be simply behavior associated with supervising an employee or is—at most—in the category of "petty slights and minor annoyances" that do not rise to the level of an adverse action. *Burlington*, 548 U.S. at 68. Further, the November 4, 2020 written warning also does not appear to be an adverse employment action. *See, e.g., Fletcher v. Didlake, Inc.*, Civ. No. 20-3446-PWG, 2021 WL 3418835, at *7 (D. Md. Aug. 5, 2021) (explaining that "a lone written warning is not materially adverse" and that "a written warning for being absent repeatedly over a period of less than two months" would not discourage a reasonable worker from engaging in protected activity (citations and quotations omitted)). However, the Court need not determine whether these constituted adverse employment actions, as Wade has failed to establish the requisite but-for causation.

[3]     It is not clear whether Wade intended to also claim that he was constructively discharged. Nevertheless, Wade has not established that he was constructively discharged, and his voluntary resignation was therefore not an adverse employment action. "To prove constructive discharge, a plaintiff must . . . show that his employer deliberately made his working conditions intolerable in an effort to induce him to quit. Plaintiff must therefore demonstrate: (1) that the employer's actions were deliberate, and (2) that working conditions were intolerable." *Heiko v. Colombo Sav.*

jury could find that retaliation for his protected activity was the but-for cause of any of these three employment actions.

### B. *Wade Fails to Establish But-For Causation*

Wade appears to rely exclusively on the temporal proximity between his complaints about the use of a racial slur and the allegedly adverse actions to establish causation. He provides no other facts to suggest a causal connection between any protected activity and any adverse action. And "[w]hile temporal proximity between a complaint and an adverse employment action can, in some cases, be used to survive summary judgment, it does not suffice here." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006); *see also Staley*, 575 F. App'x at 156 ("Although [the plaintiff's adverse employment action] occurred shortly after she filed the formal EEOC complaint, this temporal proximity alone is not sufficient to establish that her engagement in protected activity was a 'but' for' cause of [the employment action]."). Although Wade asserts that these employment actions were taken in retaliation for his protected activity, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989).

---

*Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (citations, quotations, and alterations omitted). This is a "high standard, and even truly awful working conditions may not rise to the level of constructive discharge." *Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 438 (D. Md. 2012) (citation omitted).

Although Wade explains that he was "force[d] to quit" after the November 4, 2020 meeting (ECF No. 1 at 7), "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004) (citation and quotations omitted). In addition, there is no evidence that Defendants "deliberately made his working conditions unbearable" to force him to quit. Rather, the undisputed evidence shows that Defendants intended to maintain his employment. (*See* Miller Aff. ¶ 36 (explaining that she had drafted a letter detailing the terms of Wade's continued employment); Nov. 5, 2020 Suspension Letter (explaining that Wade was to report to Human Resources after his suspension "to discuss the terms for continued employment").)

11

First, Wade fails to establish that his protected activity was a but-for cause of the purported hypervigilance and criticism from Sites. There is no evidence that Sites was motivated by Wade's protected activity. Any inference of causation is rebutted by the fact Sites began his role supervising Wade on September 7, 2020, and within less than 10 days had identified various concerns with Wade's performance, which were similar to issues Hearn had identified. *See Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (explaining that "any inference of causation that might arise out of the temporal proximity is more than rebutted by the facts that, prior to the protected activity, [the plaintiff] had been told that her performance was sub-par and that she should prepare to leave [the company]"). More fundamentally, beyond Wade's unsupported speculation that Sites knew he had reported the use of a slur, there is no evidence that Sites was even aware of Wade's protected activity. Even Wade alleged that he reported such activity to the "plant manager in Human Resources" and to Miller, not to Sites. (ECF No. 37 at 1–2; Wade Dep. at 19); *see Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (finding that summary judgment in favor of a defendant was appropriate where plaintiff did not "point[] to any evidence that" the relevant persons were aware of his protected activity).

Second, Wade fails to establish that he received the November 4, 2020 written warning because of his protected activity. The undisputed facts are that Defendants began counseling Wade as early as January 2020 regarding his behavior—months before Wade's protected activity—and that such counseling culminated in the November 4, 2020 meeting at which he was presented with a written warning. Although Wade contends that he was a good employee, he does not dispute the various instances of counseling. As an initial matter, Wade's own assessment of his performance is not credible evidence. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (in employment discrimination case, "[i]t is the perception of the decision maker which is relevant, not the self-

assessment of the plaintiff." (quotations and citation omitted)).  Further, "[w]here timing is the

only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff

had ever engaged in any protected activity, an inference of retaliation does not arise." *Francis*,

452 F.3d at 309 (citation and quotations omitted).

Third, with respect to the unpaid suspension, the undisputed facts are that a meeting

occurred on November 4, 2020 at which Wade was presented with a written warning.  The parties

disagree about the exact contours of Wade's behavior during this meeting, but it is undisputed that

Wade used profane language toward Sites and called him a liar during the meeting.  (*See, e.g.*,

Wade Dep. at 23–24 (Wade explaining that he called Sites a "lying asshole" under his breath; that

he "kept calling [Sites] a liar"; and that he was upset and raised his voice.)  Electromet's

Handbook explains that "there are certain major offenses that may result in an immediate penalty

of probation, suspension subject to discharge, or discharge without any prior counseling" and

provides a non-exclusive list of offenses, including "[t]he use of profane or abusive language[.]"

(ECF No. 35-3 at 34–35.)  Moreover, it is undisputed that the decision to suspend Wade without

pay occurred immediately following this meeting, not before.  This intervening event precludes a

finding of but-for causation with respect to Wade's unpaid suspension. *See Harik v. Wilson*, Civ.

No. AW-05-1182, 2006 WL 8457019, at *6 (D. Md. Aug. 22, 2006) ("Plaintiff's insubordination

severs the causal link between his protected activity and his termination, and Defendant is entitled

to summary judgment on Plaintiff's retaliation claims.").

In short, a reasonable factfinder could not conclude that Wade's protected activity was the

but-for cause of any adverse employment action.  Wade relies solely on temporal proximity to

establish causation, but this is insufficient given the evidence of his history of performance issues

and related instances of counseling (which began before he engaged in protected activity), and his

13

insubordination during the November 4, 2020 meeting.  Wade has failed to present any evidence

of pretext other than his own speculative opinions about Defendants' motives.  This is insufficient

to raise a genuine dispute of fact.  *See Bailey v. Anne Arundel County*, 259 F. Supp. 2d 421, 429

(D. Md. 2003) ("A plaintiff's opinions and conclusory assertions do not have sufficient probative

force to reflect a genuine issue of material fact as to the issue of pretext.").  Defendants' Motion

will therefore be granted.

### IV.     *Conclusion*

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 35) will

be granted and the case will be closed.

DATED this  5  day of June, 2023.

BY THE COURT:

James K. Bredar
Chief Judge